UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
------------------------------------------------------
                                          :
UNITED STATES OF AMERICA                  :
                                          :      CASE NO. 1:09-CR-173
                    Plaintiff,            :
                                          :
vs.                                       :      OPINION & ORDER
                                          :      [Resolving Doc. No. 25.]
JAMAL ALI                                 :
                                          :
                    Defendant.            :
                                          :
------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

On April 8, 2009, the grand jury indicted Defendant Jamal Ali, who had previously been convicted of several felonies, of one count of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). [Doc. 1.] On July 8, 2009, Defendant Ali filed a motion to suppress evidence and statements. [Doc. 25.] On July 15, 2009, Plaintiff United States of America opposed the motion. [Doc. 28.] On July 21, 2009, this Court held a hearing regarding the Defendant's motion to suppress. For the following reasons, the Court **DENIES** Defendant Ali's motion to suppress evidence and statements.

## I. Background

With this opinion and order, the Court decides whether a police officer was required to have a reasonable suspicion that Defendant Jamal Ali was involved in criminal activity before asking him questions regarding a lost or stolen phone. On March 23, 2009, Defendant Ali and his friend, Makila Dozier, waited for an afternoon bus at the Puritas Rapid Station. While they were waiting, a woman

Case No. 1:09-CR-173
Gwin, J.

named Taryn Emrich asked Ali if he had a lighter.  The Defendant responded that he did not.  Emrich was sitting on top of a newspaper box and she had been looking at her bus schedule.  After speaking to the Defendant, Emrich noticed that her cell phone, which had been lying next to her on the newspaper box, was gone.  Emrich testified that the Defendant and his female friend were the only people standing near her before she noticed that her cell phone was missing.

Emrich followed Defendant Ali into the station and asked a woman waiting there to call her cell phone; the call did not go to voicemail, but Emrich did not hear the phone ring.  The Defendant then approached Emrich and asked whether she had lost her phone – a question that Emrich found suspicious because she had not told the Defendant that her phone was missing and he was standing out of earshot when Emrich asked the woman to call Emrich's phone.  Emrich left the station and then walked back in and asked the same woman to call her phone again; this time, the call went directly to voicemail. In response to the woman's queries, Emrich pointed out the Defendant and his female friend as being the only people who were standing close to her immediately before she discovered that her phone was missing.

Following this exchange, Emrich approached Officer Lester Hill, a uniformed Regional Transit Authority police officer, and told him that her phone had been stolen.  Officer Hill asked Emrich about what had transpired; he testified that Emrich said that she was sitting on a newspaper box and asked someone for a lighter; once she got the lighter and lit her cigarette, she realized that her cell phone – previously lying next to her on the box – was gone.  According to Officer Hill, Emrich also said that one of the three people who was standing around her immediately before she

-2-

Case No. 1:09-CR-173
Gwin, J.

discovered that her cell phone was gone had taken it.[1]  Officer Hill also called Emrich's phone, but

he was unable to connect to it or to locate it.  Emrich then pointed out Defendant Ali to Officer Hill

and told him that she thought the Defendant had taken her phone.  In response to Emrich's statement

that the Defendant likely took the phone, Officer Hill approached the Defendant, who had exited the

station and was standing in line to board a bus, and asked if the Defendant would let Officer Hill

check him for the phone.[2]  Officer Hill also testified that he told the Defendant that he would hold

the bus for him.

         Defendant Ali did not answer Officer Hill's question, instead stating "I ain't got her phone."

The Defendant's demeanor changed – he became more irate – and he took several steps toward

Officer Hill and voluntarily began pulling objects out of the pockets of his jacket without Officer Hill

instructing or asking him to do so.  Among these objects was a charger for the Defendant's own cell

phone.

         As Defendant Ali removed objects from his jacket, the jacket rode up and Officer Hill

observed the black handle of a large chrome revolver sticking out of the Defendant's waistband[3].

Upon seeing the weapon, Officer Hill told the Defendant not to move and reached for the gun with

his left hand while simultaneously drawing his weapon with his right hand.  Instead of complying

---

[1]In court, Emrich stated that only the Defendant and his female friend could have taken her phone because Emrich still had her phone when the third individual had walked past her.

[2]According to both Emrich and Makila Dozier, Officer Hill then asked Defendant Ali to empty his pockets – the Defendant did so while stating that he did not have Emrich's cell phone and asking Officer Hill why he neglected to ask other individuals in the station about the allegedly stolen cell phone.  The Court does not find this testimony to be credible.  It does find to be credible Officer Hill's testimony that he would never ask an individual to empty his pockets as part of a search because this tactic is very dangerous and could lead to unpredictable and unwanted results.

[3]The gun was later determined to be an operable Smith & Wesson .44 caliber Magnum revolver, loaded with four rounds of hollow-point Remington .44 Magnum caliber ammunition.

Case No. 1:09-CR-173
Gwin, J.

with Officer Hill's directions, the Defendant reached for the gun in his waistband and began to

wrestle with Officer Hill for control of the gun.  After a brief struggle, Officer Hill was able to pull

the gun out of the Defendant's waistband.  At this point, the Defendant ran away, climbing over two

fences and crossing two railroad tracks.  Officer Hill called for back-up and the Defendant was

apprehended shortly thereafter.

On April 1, 2009, Cleveland Police Department Officer Harasimchuk and Special Agent

Honaker of the Bureau of Alcohol, Tobacco, Firearms, and Explosives read Defendant Ali his

*Miranda* rights and subsequently conducted a recorded interview with the Defendant.  The

Defendant told Officer Harasimchuk and Special Agent Honaker that he did not know that Officer

Hill was a law enforcement officer and, instead, thought that Officer Hill was a "janitorial or security

dude" or a "janitorial RTA worker."  The Defendant said that he only realized that Officer Hill was

a police officer when Officer Hill drew his duty weapon.

## II.  Legal Standard

*A. The Exclusionary Rule*

The Fourth Amendment guarantees

> [t]he right of the people to be secure in their persons, houses, papers,
> and effects, against unreasonable searches and seizures, shall not be
> violated, and no Warrants shall issue, but upon probable cause,
> supported by Oath or affirmation, and particularly describing the
> place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV.

The exclusionary rule was adopted to effectuate the Fourth Amendment right of all citizens

to be secure in their persons, houses, papers and effects and to be free from unreasonable searches

and seizures. Under this rule, evidence obtained in violation of the Fourth Amendment cannot be

-4-

Case No. 1:09-CR-173
Gwin, J.

used against a defendant in a criminal proceeding. *Mapp v. Ohio*, 367 U.S. 643 (1961); *Wong Sun v. United States*, 371 U.S. 471, 485 (1962) ("The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion.").

"[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, . . . but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'" *Segura v. United States*, 468 U.S. 796, 804 (1984) (citations omitted).   The exclusionary rule extends to the point at which the connection between the illegal search and seizure and the derivative evidence "may have become so attenuated as to dissipate the taint." *Nardone v. United States*, 308 U.S. 338, 341 (1939); *see also United States v. Vasquez*, 638 F.2d 507, 527 (2d Cir. 1980) (holding that "suppression is required of any items seized during the search of the house, unless the taint of the initial entry had been dissipated before the 'consents' to search were given").

*B. Custodial Interrogation*

The Fifth Amendment prohibits authorities from compelling any person "in any criminal case to be a witness against himself." U.S. CONST. amend. V.  Consistent with the Fifth Amendment's privilege against self-incrimination, a suspect may not be subject to a custodial interrogation until after being advised of his *Miranda* rights.  *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998). Custodial interrogations include "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  A suspect is in custody if, under the totality of the circumstances, a reasonable person would not have felt free to terminate the encounter and leave. *Yarborough v. Alvarado*, 541 U.S. 652, 663-65 (2004).

Case No. 1:09-CR-173
Gwin, J.

*C.* Terry *Stops*

Under *Terry v. Ohio*, 392 U.S. 1 (1968), a police officer whose observations lead him to reasonably suspect that a particular individual has committed, is committing, or is about to commit a crime may detain that person briefly in order to investigate the circumstances that provoked suspicion. 392 U.S. at 21-22, 30; *see also Delaware v. Prouse*, 440 U.S. 648 (1979). Police officers can make an investigatory stop if they have a reasonable, articulable suspicion that a person is engaged in criminal activity. *Terry*, 392 U.S. at 21 Generalized suspicions are insufficient. When police reasonably suspect that a person is engaged in criminal activity, police may stop that person, question him for a limited period of time, and frisk him for weapons. To proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous. *Arizona v. Johnson*, 129 S.Ct. 781, 784 (2009).

"Reasonable suspicion" is a less stringent standard than probable cause, but must be supported by specific and articulable facts. The presence of an individual in a dangerous or a high crime area will not, alone, justify a *Terry* stop, but it is a factor that law enforcement can consider in evaluating the existence of reasonable suspicion. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation."). Further, "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Id.* (citations omitted).

Overall, "the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior," *id.* at 125, and the facts and circumstances giving rise to reasonable suspicion are to be "seen and weighed not in terms of library analysis but as

-6-

Case No. 1:09-CR-173
Gwin, J.

understood by those versed in law enforcement," *United States v. Cortez*, 449 U.S. 411, 418 (1981).

In evaluating the validity of a *Terry* stop, a court must consider "the totality of the circumstances."

*Id.* at 417.

*D. Consensual Stops*

One category of police-citizen encounters, in addition to arrests requiring probable cause and

*Terry* stops requiring reasonable suspicion, are consensual encounters where an officer seeks the

"voluntary cooperation of a citizen [that] require[] no suspicion at all . . . ." *United States v. Clay*,

No. 07-6380, 2009 WL 928564, at * 2 (6th Cir. 2009) (citing *United States v. Dotson*, 49 F.3d 227,

230 (6th Cir. 1995)).  "A law enforcement officer does not violate the Fourth Amendment merely

by approaching an individual, even when there is no reasonable suspicion that a crime has been

committed, and asking him whether he is willing to answer some questions." *United States v. Erwin*,

155 F.3d 818, 823 (6th Cir. 1998) (citing *Florida v. Royer*, 460 U.S. 491, 497 (1983)).  In the

voluntary or consensual stop context, however, "absent reasonable suspicion of criminal activity, a

law enforcement officer must allow an individual to leave if he so requests, and any consent obtained

by the officer's refusal to permit him to do so is invalid." *United States v. Canipe*, No. 08-5534,

2009 WL 1852895, at *3 (6th Cir. 2009) (quoting *Erwin*, 155 F.3d at 823); *see also Florida v.*

*Bostick*, 501 U.S. 429, 434 (1991)  (internal citations and quotation marks omitted) ("So long as a

reasonable person would feel free to disregard the police and go about his business, the encounter

is consensual and no reasonable suspicion is required. The encounter will not trigger Fourth

Amendment scrutiny unless it loses its consensual nature.").

A consensual encounter transforms into a seizure when, "in view of all the circumstances

surrounding the incident, a reasonable person would have believed that he was not free to leave."

-7-

Case No. 1:09-CR-173
Gwin, J.

*United States v. Mendenhall*, 446 U.S. 544, 554 (1980). "Circumstances indicative of a seizure include 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" *United States v. Jones*, 562 F.3d 768, 772 (6th Cir. 2009) (citing *Mendenhall*, 446 U.S. at 554).

### III.  Analysis

Defendant Ali's motion to suppress fails because the evidence in this case – the gun, ammunition, and certain statements – was obtained by police during (or a result of) a consensual stop.  Moreover, even if the encounter between the Defendant and the police is characterized as a *Terry* stop, such a stop would have been justified because the police officer reasonably suspected that the Defendant had committed a crime.  As a result, the Court denies the Defendant's motion to suppress.

*A. Voluntary or Consensual Stop*

The evidence in question in this case was obtained during a consensual encounter between Defendant Ali and Officer Hill and, as a result, the Court declines to suppress this evidence.  Officer Hill was entitled to seek the Defendant's voluntary cooperation, including asking the Defendant whether he would consent to a search and answer some questions, without needing to have any suspicion that the Defendant had committed a crime.  See *Clay*, 2009 WL 928564, at * 2; *Erwin*, 155 F.3d at 823.  Such an encounter would continue to be consensual – not triggering Fourth Amendment scrutiny – until the Defendant (or a reasonable person) would have felt that he was not free to leave. *See Mendenhall*, 446 U.S. at 554.

Officer Hill testified credibly that he asked whether the Defendant would allow Officer Hill

Case No. 1:09-CR-173
Gwin, J.

to check him for the missing cell phone and that, instead of declining this request or asking if he could be permitted to leave, the Defendant voluntarily began removing items from his pockets.  As his later statements demonstrate, the Defendant did not even realize that Officer Hill was a police officer, further supporting the argument that the encounter between the Defendant and Officer Hill was consensual because the Defendant would have necessarily felt free to "disregard [Officer Hill] and go about his business." *Bostick*, 501 U.S. at 434.

Prior to Officer Hill seeing Defendant Ali's weapon, the consensual encounter had not transformed into a seizure because the Defendant still felt that he was free to leave, there were no other officers present on the scene, Officer Hill had not had any physical contact with the Defendant, and Officer Hill's tone and demeanor was calm and casual.  *Jones*, 562 F.3d at 772 (citing *Mendenhall*, 446 U.S. at 554).  Once he saw the Defendant's gun, however, Officer Hill was entitled to act for his own protection and for the protection of the individuals around him.  *United States v. Townsend*, 206 Fed. Appx. 444, 448 (6th Cir. 2006) ("[T]he observed presence of a handgun within [the defendant's] reach clearly enhanced the suspiciousness of the circumstances and called for swift and sure action.").

B.  *Reasonable Suspicion Supporting the* Terry *Stop*

Even if the encounter between Defendant Ali and Officer Hill was not consensual and is characterized as a *Terry* stop, Officer Hill had the reasonable suspicion necessary to perform the stop.  As was mentioned above, under *Terry*, a police officer whose observations lead him to reasonably suspect that a particular individual has committed, is committing, or is about to commit a crime may detain that person briefly in order to investigate the circumstances that provoked suspicion.  392 U.S. at 21-22, 30.  To proceed from a stop to a frisk, the police officer must

-9-

Case No. 1:09-CR-173
Gwin, J.

reasonably suspect that the person stopped is armed and dangerous. *Johnson*, 129 S.Ct. at 784.

In this case, Officer Hill was informed that Defendant Ali and his friend were the only people standing near Emrich immediately before she discovered that her cell phone was missing and that the Defendant had likely taken Emrich's phone. Thus, Officer Hill was entitled to stop the Defendant because he had a reasonable suspicion that the Defendant had committed a crime.

Further, Officer Hill was entitled to stop the Defendant from accessing his weapon once he noticed that the Defendant was armed. The Supreme Court has recognized the propriety of police officers' use of protective measures to prevent subjects of *Terry* stops from accessing weapons. *See Michigan v. Long*, 463 U.S. 1032, 1051-52 (1982). The *Terry* Court held that a *Terry* investigation is, by its nature, conducted "at close range," *Terry*, 392 U.S. at 24, and that the officer is often required to make a " quick decision as to how to protect himself and others from possible danger," *id.* at 28. The Court has also held that law enforcement officers cannot be required to "decide instantaneously what 'less intrusive' alternative exists to ensure that any threat presented by the suspect will be neutralized." *Long*, 463 at 1053 n. 16; *see also United States v. Sharpe*, 470 U.S. 675, 686-87 (1985). In evaluating the reasonableness of police conduct undertaken in the context of a "swiftly developing" *Terry*-type situation, the Court has accordingly counseled that reviewing courts must refrain from indulging in "unrealistic second-guessing." *Id.* at 686.

Thus, even if Officer Hill's stop of Defendant Ali is characterized as a *Terry* stop and not as a voluntary stop, the Court determines that the stop was lawful and that Officer Hill did not exceed the scope of his authority under *Terry*. The Court therefore denies the motion to suppress the

Case No. 1:09-CR-173
Gwin, J.

evidence and statements[4/] resulting from the stop.

## IV.  Conclusion

For the foregoing reasons, the Court **DENIES** Defendant Ali's motion to suppress evidence

and statements.

IT IS SO ORDERED.

Dated: July 22, 2009                                             s/          *James S. Gwin*
                                                                 JAMES S. GWIN
                                                                 UNITED STATES DISTRICT JUDGE

---

[4/] Because the stop of the Defendant was lawful and reasonable under the circumstances and the Defendant made statements freely and voluntarily both prior to and following the recitation of his Miranda rights, the suppression of the Defendant's statements is unwarranted.